IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTINA PALMER | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 05-2023 |
| AMERIBANQ MORTGAGE GROUP, LLC, | : | |
| ET AL. | : | |

SURRICK, J.                                                    OCTOBER   6  , 2010

## MEMORANDUM

Plaintiff Christina Palmer alleges that Defendant Ameribanq Mortgage Group, LLC, committed violations of various federal and state laws in connection with a mortgage transaction in 2004. Plaintiff filed an Amended Complaint on October 14, 2008. (Doc. No. 35.) Count One seeks statutory damages and attorney's fees under the Truth-in-Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, for Ameribanq's alleged failure to provide Plaintiff with a notice of her right to cancel and for Ameribanq's alleged failure to disclose the finance charges associated with the transaction. Count Two seeks rescission of the mortgage under § 1635(b) of TILA because Ameribanq's omissions were material. Count Three seeks damages under the federal Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*, because Ameribanq allegedly substituted different, less favorable terms in the mortgage transaction without advising Plaintiff. Count Four seeks recovery under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Cons. Stat. § 201-1 *et seq.*, because Ameribanq made misrepresentations and intended to confuse Plaintiff in connection with the mortgage transaction. After a bench trial, and after review of the parties' post-trial submissions, we conclude that Ameribanq did not provide Plaintiff with an accurate disclosure of the finance charges associated

with the transaction and that Plaintiff is entitled to relief on Count I. We further conclude that Ameribanq and the other Defendants, assignees of Plaintiff's mortgage, are entitled to judgment in their favor on the remaining counts in the Amended Complaint. In accordance with Federal Rule of Civil Procedure 52, we make the following findings of fact and conclusions of law.

## I.    FINDINGS OF FACT

1.    Plaintiff Christina Palmer and her husband Gregory Palmer both testified at trial. Neither was a convincing witness. Plaintiff's testimony was less than credible on a number of material points. Her testimony was directly contradicted in several significant areas. After watching Plaintiff testify and hearing what she had to say in light of all of the other evidence presented, it was apparent that Plaintiff's testimony was not designed to be factually accurate but rather was designed to support the claims that she is making. The testimony of Plaintiff's husband was of little value.

2.    In 2004, Plaintiff owned and resided at the residential property located at 4945 Chester Creek Road, Brookhaven, Pennsylvania (the "Property").

3.    Plaintiff had a fixed-rate mortgage on the Property. Her monthly payments were $1429, including taxes and insurance. (Trial Tr. 33:17-25 to 34:1-6.)

4.    On September 26, 2004, Plaintiff telephoned Ameribanq to apply for a loan (the "Loan") to refinance the Property. Plaintiff spoke with Ameribanq representative Jared Weisfeld. Weisfeld faxed Plaintiff a loan application package. Plaintiff signed and dated copies of the following documents and faxed them back to Weisfeld on September 26, 2004: a Good Faith Estimate (Ex. D-1), a Preliminary

Federal Truth in Lending Disclosure Statement (Ex. D-3), and a Notices & Disclosures to Applicant form (Ex. D-5). Plaintiff's testimony that she did not receive these documents was not credible. (*See* Trial Tr. 34:20-23, 35:15-17.) Plaintiff's testimony that she did not date the Preliminary Truth in Lending Disclosure Statement documents was also not credible. (*See, e.g.*, *id.* 87:4 to 90:13.)

5. The Good Faith Estimate listed the amount of the loan as $217,600. The Preliminary Federal Truth in Lending Disclosure Statement provided estimates of the annual percentage rate (14.015%); the finance charge ($793,459.74); the amount financed ($208,849.83); and the total payments ($1,005,309.57). The Preliminary Federal Truth in Lending Disclosure Statement further estimated the monthly payments of the Loan to commence at $1790.14 a month for the first 36 months increasing to $2914.90 a month for the final 312 months.

6. The parties do not agree with regard to the date on which the loan closed. Plaintiff contends that it closed on October 6, 2004. Defendants contend that it closed on October 7, 2004. Some of the closing documents contained both dates. For example, the Truth in Lending Disclosure Statement contained a type-written date of October 6, 2004, but a handwritten date of October 7, 2004. (*See, e.g.*, Ex. D-11.) Plaintiff testified that the loan closed on October 6, 2004. (Trial Tr. 36:5 to 37:2.) Plaintiff's testimony on this issue was directly contradicted and it was not convincing or credible. Defendants offered the testimony of Maureen Nihill, the notary who attended the closing, and Frances Bedekovic, Ameribanq's

liquidating manager, to establish that the Loan closed on October 7, 2004. (*See, e.g.*, *id.* at 155:7 to 158:25; 207:17 to 211:9.) Nihill and Bedekovic were both credible witnesses. We find that the closing was initially scheduled for October 6, but it took place on October 7. (*See id.* at 167:16 to 169:5.)

7. Any discrepancies in the closing documents between the type-written dates and the hand-written dates were clerical errors arising from the date change. Defendants offered Bedekovic's testimony to establish that in October 2004 Ameribanq utilized a loan-document preparation software program known as MRG. (*Id.* at 204:20 to 205:7.) The purpose of the software was to ensure that loan documents were prepared in accordance with industry standards. (*Id.*) Ameribanq retained Mortgage Resource Network, an independent vendor, to audit the documents prior to the closing. (*Id.* at 205:11-24.) After the closing but prior to Ameribanq funding the loan, Mortgage Resource Network performed a second audit of the closing documents. (*Id.* at 206:23-25; *see also* Ex. D-25.)

8. Plaintiff received and signed the following documents at the closing: a Notices and Disclosure to Applicant form (Ex. D-5); a Settlement Statement from Rockwood Title and Settlement Group (Ex. D-6); a Truth in Lending Disclosure Statement (Ex. D-9 (hereinafter, the "Final Disclosure Statement")); two copies of the Notice of Right of Rescission (Exs. D-12, D-14; *see also* Trial Tr. 155:19 to 156:8); an Adjustable Rate Note (Ex. D-16); a Mortgage Contract (Ex. D-18); an Adjustable Rate Rider to the Mortgage Contract (Ex. D-19); an Initial Escrow Account Disclosure Statement (Ex. D-21); a Compliance Agreement (Ex. D-22);

and a First Payment Letter (Ex. D-23). Plaintiff admitted to signing some of these documents. (Trial Tr. 38:23.) However, she denied signing several of them, asserting that those documents that she contends she did not sign were forgeries. (*Id.* at 46:19-22; 73:23 to 74:16; 77:9 to 79:5; 92:19 to 93:20; *see also* Pl.'s Pretrial Mem. at 3.) Plaintiff's testimony in this regard was not credible. We find that Plaintiff did in fact sign the documents that Defendants contend that she signed at the closing. (*See id.* at 153:2-20; 193:22 to 194:17; 209:1-5; 210:12-23; Ex. D-25.) The above-listed documents from September or October that bear Plaintiff's signature are not forged. The testimony of Defendants' handwriting expert who identified Plaintiff's signature on the documents was credible.

9.  The amount of the Loan was $217,600. (Ex. D-6.) The Final Disclosure Statement that Plaintiff received at the closing set out, among other things, the annual percentage rate (11.184%); the fact that the "loan contain[ed] a variable-rate feature"; the finance charge ($547,324.76); the amount financed ($208,808.80); and the total payments ($756,133.56). The Final Disclosure Statement further set out the monthly payments of principal and interest on the Loan, which started at $1790.14 a month for the first 36 months and increased to $2137.01 a month for the final 318 months. The First Payment Letter informed Plaintiff that her monthly payments would include additional fees for insurance and taxes and that her initial total monthly payment was $2347.99: $1790.14 for principal and interest; $67.42 for hazard insurance; $92.42 for flood insurance; and $398.01 for real estate taxes. (Ex. D-23.) In addition to the First Payment

Letter informing Plaintiff that her monthly payments would include insurance and taxes, the Notices and Disclosures to Applicant and the Initial Escrow Account Disclosure Statement informed Plaintiff that her monthly payments would include escrow payments to cover taxes and insurance. (Exs. D-5, D-21.)

10. The Settlement Statement, also known as a HUD-1 form, listed the loan amount and itemized the Settlement Charges, the Reserves Deposited with the Lender, the Title Charges, and the Disbursements to Others. Among those receiving disbursements from the settlement were the holder of Plaintiff's original mortgage, Wells Fargo Bank, in the amount of $173,215.80; Harley Davidson, in the amount of $8473; Resorts USA, in the amount of $1676; and Dell Financial, in the amount of $2337.

11. Plaintiff's husband did not participate in the loan-making process. Even though his name was not on the deed to the property, he was aware of the fact that Plaintiff was obtaining a loan to refinance the Property. (*See id.* at 113:1-3.) Plaintiff's husband testified to his belief that the Loan payments were supposed to be about $1700 a month, including taxes and insurance. (*Id.* at 113:4-7.) When he discovered the amount of the loan he became "angry" and "infuriated." (*Id.* at 114:8; 117:3-4.) The testimony offered by Plaintiff and her husband regarding Plaintiff's husband's involvement in the loan process was contradictory and unconvincing. (*See, e.g.*, *id.* at 100:13-15; 101:1-3.)

12. The Loan was funded on or about October 12, 2004. (Ex. D-6.) Shortly thereafter, Ameribanq assigned the Loan to Countrywide Home Loans, Inc. (Trial

Tr. 240:24 to 241:14.)  Countrywide later assigned the Loan to Bank of New York.  (*Id.* at 241:3.)  Countrywide currently services the Loan, and Bank of New York currently holds it.  (*Id.* at 241:15-16.)

13.    Approximately two months after the closing, Plaintiff received a Federal Express envelope from Ameribanq containing a second notice of the right to rescind.  (Ex. P-4; *see also* Trial Tr. 48:17 to 49:2.)  The letter, dated December 7, 2004, stated: "Thank you for giving us the opportunity to assist you with the refinance of your home.  It has come to our attention that the enclosed form(s) have been misplaced or omitted at the time of closing.  **ORIGINAL NOTICE OF RESCISSION: PLEASE SIGN & DO NOT DATE IT."  (*Id.*)  Attached to the letter was a second Notice of Right of Rescission.  (Ex. P-5.)

14.    Plaintiff testified that she did not read this notice or know what the notice was about.  (Trial Tr. 49:6-7; 90:22-23.)  On direct examination, Plaintiff testified that when she received the Federal Express envelope, she "opened it and looked at it and just put it back in the envelope and put it on her entertainment center."  (*Id.* at 49:4-5.)  On cross-examination, Plaintiff testified that she looked at the letter and understood that it was from Ameribanq (*id.* at 91:18) and that, despite the fact that she had actively yet unsuccessfully sought to communicate with Ameribanq (*see id.* at 39:11 to 40:17), she did not read it.  She explained that she did not read the letter because Ameribanq "never returned my calls and I couldn't get in touch with them . . . . so I figured why are they sending me a letter."  (*Id.* at 91:19-20.)  This explanation is unpersuasive and it lacks credibility, especially in the light of

other testimony given by Plaintiff. She maintained that at no time could she afford the $2300 per month payments (*id.* at 38:19-21), yet, she disregarded her right to rescind sent about two weeks after her first payment was due (Ex. D-23).

15.     Plaintiff made her monthly payments of $2347.99 starting in December 2004. (*See* Trial Tr. 47:20 to 48:3.) Sometime in early 2005, Plaintiff became concerned that she could not afford her mortgage payments. (*See id.* at 50:15-17.) This coincided with her husband's discovery of the amount of the monthly payment. Whether from concern about not being able to afford the monthly payments or concern of her husband's anger, Plaintiff retained counsel. (*See id.* at 51:2-5.) On March 7, 2005, Plaintiff's counsel sent a letter to Countrywide and Ameribanq seeking to rescind the loan. (Ex. P-6.) Plaintiff did not receive a response from Countrywide or Ameribanq. (Trial Tr. 51:18-20.)

16.     Several court actions ensued. Plaintiff filed the instant action on April 28, 2005. (*Id.* at 51:24 to 52:4.) Bank of New York filed an action in the Court of Common Pleas of Delaware County to foreclose on the Property. (Ex. P-15; *see also* Trial Tr. 17:17-21.) In October 2006, Plaintiff and her husband filed for bankruptcy. (*Id.* at 52:21 to 53:9; *see also* Ex. P-14.) The bankruptcy action automatically stayed the state-court foreclosure proceedings. (*See* Trial Tr. 57:15 to 58:17.) For a time, Plaintiff made modified payments pursuant to an order by the bankruptcy judge. (Trial Tr. 55:8-11; 56:13-16.) In April 2008, Plaintiff and her husband received a discharge, eliminating personal responsibility for the loan. (Ex. P-14; Trial Tr. 15:4-6.) The foreclosure action remains pending. (Trial Tr. 14:22-23;

17:17-25; 58:20 to 59:5.)

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

1.      We have jurisdiction over Plaintiff's TILA claims under 15 U.S.C. § 1640(e) and 28 U.S.C. § 1331; Plaintiff's ECOA claim under 15 U.S.C. § 1691e(f) and 28 U.S.C. § 1331; and Plaintiff's UTPCPL claim under 28 U.S.C. § 1367.

### B. TILA

2.      "TILA is a federal consumer protection statute, intended to promote the informed use of credit by requiring certain uniform disclosures from creditors." *In re Cmty. Bank of N. Va. & Guar. Nat'l Bank of Tallahassee Second Mortg. Loan Litig.*, 418 F.3d 277, 306 (3d Cir. 2005). "[A]s a remedial statute which is designed to balance the scales 'thought to be weighed in favor of lenders,' [TILA] is to be liberally construed in favor of borrowers." *Smith v. Fid. Consumer Disc. Co.*, 898 F.2d 896, 898 (3d Cir. 1988) (quoting *Bizier v. Globe Fin. Servs.*, 654 F.2d 1, 3 (1st Cir. 1981)).

3.      TILA authorizes the Board of Governors of the Federal Reserve System to promulgate regulations necessary to effectuate the Act's purpose. 15 U.S.C. § 1604. The Federal Reserve Board's regulations, known as Regulation Z , are codified at 12 C.F.R. § 226.1 *et seq.* The Supreme Court has directed courts to afford Regulation Z strong deference. *Cetto v. LaSalle Bank Nat'l Ass'n*, 518 F.3d 263, 274 (4th Cir. 2008) ("'Congress has specifically designated the Federal Reserve Board and staff as the primary source for interpretation and application of truth-in-lending law.'" (quoting *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980))); *Hamm v. Ameriquest Mortg. Co.*, 506 F.3d 525, 528 (7th Cir. 2008) ("The

Supreme Court has held that 'deference is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z [and,]. . . [u]nless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive.'" (quoting *Mihollin*, 444 U.S. at 565)).

### *(1)     Notice of Right of Rescission*

4.      TILA mandates that creditors clearly and conspicuously disclose to borrowers that borrowers have the unilateral right to rescind a loan transaction for a brief period after consummation.  15 U.S.C. § 1635(a); 12 C.F.R. § 226.23(a)(3); *see also Davis v. Deutsche Bank Nat'l Trust Co.*, No. 05-4061, 2007 U.S. Dist. LEXIS 83307, at *5 (E.D. Pa. Nov. 8, 2007).  This right allows the borrower to rescind the transaction until midnight of the third business day following the transaction or the delivery of the notice of rescission along with the other material disclosures required under TILA, whichever occurs later.  15 U.S.C. § 1635(a).

5.      Regulation Z provides that

a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind . . . .  The notice shall be on a separate document that identifies the transaction and shall *clearly and conspicuously* disclose the following:

(i) The retention or acquisition of a security interest in the consumer's principal dwelling.  (ii) The consumer's right to rescind the transaction.  (iii) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.  (iv) The effects of rescission, as described [by 12 C.F.R. § 226.23(d)].  (v) The date the rescission period expires.

12 C.F.R. § 226.23(b)(1) (emphasis added).

6.      Failure to provide the required notices extends a borrower's unilateral right of rescission to three years or until the borrower sells the property, whichever occurs first. 12 C.F.R. § 226.23(a)(3) ("If the required notice or material disclosures are not delivered, the

right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first."); *see also* 15 U.S.C. § 1635(f).

7.    As required by Regulation Z, Ameribanq provided Plaintiff with two notices of her right to rescind at the closing on October 7, 2004.  Plaintiff signed the notices.  (*See* Exs. D-12, D-14; Trial Tr. 155:19 to 156:8.)  Under TILA, Plaintiff's signature on the notices "does no more than create a rebuttable presumption of delivery thereof."  15 U.S.C. § 1635(c).  As noted in the Findings of Fact, Plaintiff's testimony that she did not receive the notices was not credible. *Cf. Oscar v. Bank One, N.A.*, No. 05-5928, 2006 U.S. Dist. LEXIS 6410, at *9 (E.D. Pa. Feb. 17, 2006) (holding that the plaintiff's assertion that he did not receive closing documents that bore his signature was, at the summary judgment stage, insufficient to overcome presumption of delivery), *appeal dismissed*, 223 F. App'x 164 (3d Cir. 2007).  Since Plaintiff introduced no other credible evidence to rebut the presumption of delivery, § 1635(c) is of no aid to her.

8.    The Notice of Right of Rescission that Ameribanq provided to Plaintiff is substantially similar to the form of notice set out in Appendix H to Regulation Z.  *See* 12 C.F.R. § 226.23(b)(2); 12 C.F.R. pt. 226, app. H-8; *see also* 15 U.S.C. § 1604(b) (providing that creditors that use the Federal-Reserve-Board-drafted forms are necessarily in compliance with TILA).  The one significant difference between the form recommended by Regulation Z and the form that Ameribanq provided to Plaintiff is that the form that Ameribanq provided to Plaintiff contained an additional section titled "Acknowledgment of Receipt," which contained a blank line for a signature and the date.  (Ex. D-12.)  This alteration did not "affect the substance, clarity, or meaningful sequence of the disclosure," and thus did not alter the adequacy of the

disclosure.  *See* 15 U.S.C. § 1604(b).

      9.     The Notice of Right of Rescission provided:

> You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:
> (1) the date of the transaction, which is October 6, 2004 (i.e., the date you signed your loan documents);
> (2) the date you received your Truth in Lending disclosures; or
> (3) the date you received this notice of your right to cancel.
> . . . .
> If you cancel by mail or telegram, you must send the notice no later than midnight of October 9, 2004 (or midnight of the third business day following the latest of the three events listed above).

(Ex. D-12.)  The closing occurred on October 7, 2009.  Plaintiff signed and dated the Notice of Right of Rescission on that date.  Thus, both the description of the date of the transaction as October 6, 2004, and the October 9, 2004, deadline for sending the notice of rescission are incorrect.  As noted in the Findings of Fact, this defect is a result of a clerical error.

      10.     This clerical error raises the question of whether the Notice of Right of Rescission that Plaintiff received at the closing on October 7, 2009, violated TILA and Regulation Z, thus extending Plaintiff's right of rescission to three years from the date of the transaction.  *See* 12 C.F.R. § 226.23(a)(3).  To answer this question, we must determine what standard to apply to the defective notice form and whether TILA's bona fide error exemption, 15 U.S.C. § 1640(c), applies to the error.

      11.     There is a split among the courts of appeals that complicates the first step of our inquiry.  Some courts have adopted a "hyper-technical" or "punctilious compliance" standard for TILA while others have adopted an "any reasonable person" standard.  *Compare Hamm*, 506 F.3d at 529-30 ("We have held that, when it comes to TILA, 'hypertechnicality reigns.'  This is

not, we recognize, the formulation that some of our sister circuits use." (citations omitted)), *with Melfi v. WMC Mortg. Corp.*, 568 F.3d 309, 312 (1st Cir. 2009) ("Our test is whether any reasonable person, in reading the [disclosure] form provided . . . , would . . . understand it."). *See also Aubin v. Residential Funding Co., LLC*, 565 F. Supp. 2d 392, 397 n.3 (D. Conn. 2008) (noting the "apparent conflict among circuits regarding whether technical errors are sufficient to trigger the three-year rescissory period"). In 1995, Congress passed amendments to TILA "to clarify the intent of [the] Act and to reduce burdensome regulatory requirements on creditors." Truth in Lending Act Amendments of 1995, Pub. L. No. 104-29, 109 Stat. 271, 271. The First and Eleventh Circuits interpret the 1995 TILA amendments as a congressional rejection of the hypertechnical standard of review of TILA disclosures. *See Santos-Rodriguez v. Doral Mortg. Corp.*, 485 F.3d 12, 17 & n.6 (1st Cir. 2007) ("As this court has recently said, the 1995 TILA amendments . . . were intended by Congress to 'provide higher tolerance levels for what it viewed as honest mistakes in carrying out disclosure obligations." (quoting *McKenna v. First Horizon Home Loan Corp.*, 475 F.3d 418, 424 (1st Cir. 2007))); *Smith v. Highland Bank*, 108 F.3d 1325, 1327 & n.4 (11th Cir. 1997) (interpreting the legislative history of the 1995 TILA amendments to mean "that Congress would not have us adopt a hypertechnical reading of any part of TILA").

12.     The Third Circuit's approach to TILA rescission disclosures in *In re Porter*, 961 F.2d 1066, 1076-78 (3d Cir. 1992), which was decided before Congress amended TILA, provides some guidance. In *In re Porter*, the plaintiff took out several mortgages with the defendants, which were affiliated entities. *Id.* at 1068-69. The parties disputed whether the final loan that the plaintiff took out was a new mortgage or a partially exempt refinancing, a distinction that

13

materially altered the implications of electing to rescind the transaction and thus the form of notice to which the plaintiff was entitled. *Id.* at 1070-71. The defendant provided the plaintiff with a rescission notice modeled on the one promulgated by the Federal Reserve Board for new mortgages (an H-8 notice). The defendant argued that the H-8 notice was sufficient. Plaintiff maintained that she should have received the model notice for refinancings (an H-9 notice). *See id.* at 1076. The court disagreed with the contention of both parties, finding that neither notice accurately reflected the transaction. *Id.* In reaching this conclusion, the court observed that

> [the plaintiff's] case does not stand or fall on what notice she could have received, but on the clarity of the notice that she did receive. The mere existence of the H-9 is not enough to demonstrate that the H-8 was inappropriate in her "refinancing" context. Ideally, because neither the H-8 nor the H-9 applied perfectly to the 1987 transaction as structured, [the defendant] should have provided [the plaintiff] with its own nonstandard notice form, perhaps a hybrid of the two. *But the law does not require an ideal notice of rescission rights, just a clear, accurate, and conspicuous one.* To determine whether the notice that [the plaintiff] did receive was confusing or misleading, we have no choice but to embark on a close reading of that notice . . . .

*Id.* (emphasis added). The court found the defendant's use of the H-8 was confusing or misleading because the form was subject to two "sensible" readings that had "quite different legal implications." *Id.* at 1077 ("Because both readings are plausible, we conclude that the H-8 did not provide [the plaintiff] with a clear notice of what her right to rescind entailed."). As a result, the defendant violated TILA and the plaintiff was entitled to rescind the loan. *Id.* at 1078.

13. The court in *In re Porter* concluded its analysis with an acknowledgment

> that [the defendant's] violation of TILA was probably unintentional, and that [the defendant] may have relied upon the bankruptcy court's earlier decisions that similarly structured transactions were not "refinancings" so that the H-8 was an acceptable notice for those transactions. Moreover, [the plaintiff] herself, like most borrowers, may never have read or been confused by [the defendant's] cancellation notice. Nevertheless, "TILA achieves its remedial goals by a system of strict liability in favor of the consumers when mandated disclosures have not been made. A creditor who

> fails to comply with TILA in any respect is liable to the consumer under the statute
> regardless of the nature of the violation or the creditor's intent. 'Once the court finds
> a violation, no matter how technical, it has no discretion with respect to liability.'"
> *Smith v Fidelity Consumer Discount Co.*, 898 F2d 896, 898 (3d Cir. 1990) (citations
> omitted). Our decision thus cannot turn on whether or not [the defendant] is
> blameworthy in an abstract sense, or on whether or not [the Plaintiff] has suffered an
> injustice.

*Id. In re Porter* stands for the proposition that once a violation has been found, the creditor's

fault and the borrower's reliance are irrelevant. However, as the court's analysis makes clear,

there must first be a violation before strict liability applies. In *In re Porter* the violation arose

from there being two plausible readings of the rescission notice, which created the possibility of

confusion. *See id.* at 1077. Hence, the notice was not clear, accurate, and conspicuous.

14. The First Circuit recently addressed defective TILA rescission notices that are

similar to the one at issue in the instant case. *See Melfi*, 568 F.3d at 310-11; *Palmer v. Champion*

*Mortg.*, 465 F.3d 24, 26 (1st Cir. 2007). These cases are instructive. In *Melfi*, the rescission

notice contained blank spaces for the date of the transaction and the date to rescind. *Melfi*, 568

F.3d at 310. The court concluded that the blank spaces did not render the notice confusing and

noted that "technical deficiencies do not matter if the borrower receives a notice that effectively

gives him notice as to the final date for rescission and has the three full days to act." *See id.* at

312-13.

15. In *Champion*, the plaintiff received closing documents, including a rescission

notice, several days after the March 28, 2003, closing on her loan. 465 F.3d at 26. Despite the

fact that the plaintiff received the closing papers several days after the closing, the rescission

notice listed the date of the transaction as March 28, 2003, and the cancellation date of April 1,

2003, a date that had already passed when the plaintiff received the closing papers. *Id.* The court

refused to treat the defect as a violation of TILA that would extend the rescission period from three days to three years.  The Court reasoned that:

> [a]lthough the Notice does state, in part that rescission has to occur "no later than midnight of APRIL 01, 2003," the plaintiff wrests this statement from its contextual moorings.  The statement is followed immediately by a parenthetical reading "(or midnight of the third business day following the latest of the three (3) events listed above)."  We fail to see how any reasonably alert person – that is, the average consumer – reading the Notice would be drawn to the April 1 deadline without also grasping the twice-repeated alternative deadlines.
>
> This facial transparency is bolstered by the fact that the language of the Notice closely tracks the language of the model form.  This is, at the very least, prima facie evidence of the adequacy of the disclosure.  *See* 12 C.F.R. § 226 Supp. I, Intro. para. 1 ("Good faith compliance with [the Federal Reserve Board's] commentary affords protection from liability under [TILA].").  Accordingly, we agree with the district court that the Notice was crystal clear and, thus, did not trigger an extended rescission right under the TILA.

*Id.* at 28-29 (footnote omitted; alterations in original).

16.     The approach taken by the First Circuit in *Melfi* and *Champion* is not substantially different than the approach taken by the Third Circuit in *In re Porter*.  The difference in outcome does not result from a difference in approach.  Both courts looked to whether the allegedly defective notice was subject to more than one plausible reading.  The primary difference between the cases is factual:  whereas the Third Circuit found two plausible readings of the notice of rescission at issue in *In re Porter*, the First Circuit found that, notwithstanding facial defects, the rescission notices at issue in *Melfi* and *Champion* were not subject to more than one plausible reading.

17.     Applying this standard to the instant case, we conclude that the notice form that Plaintiff received at the closing is not subject to more than one plausible reading.  Plaintiff knew that she received the form on October 7.  Thus it was clear that the first of the three conditions

did not apply to her.  There was then, and is now, only one plausible reading of the rescission form in this case:  Plaintiff had three business days from October 7th to send in her rescission notice.[1]

18.    Even if the defect in the Notice of Rescission were a violation of TILA and Regulation Z, Defendants have raised the bona fide error defense contained in 15 U.S.C. § 1640(c).  That exemption from liability provides that a creditor may not be held liable for a TILA violation if the creditor "shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error."  *Id.*  Errors covered by the exemption include clerical and calculation mistakes, but do not include errors of legal judgment.  *Id.*

19.    The errors contained in the Notice of Rescission are clerical in nature.  There is no dispute that the closing was originally scheduled for October 6, 2004.  It is apparent from the closing documents and from the testimony of Maureen Nihill, the closing agent, that the closing was rescheduled to October 7, 2004.  (*See, e.g.*, Ex. D-12; Trial Tr. 156:18 to 158:2; 167:16 to 169:7.)  As discussed in the Findings of Fact, Plaintiff's testimony that the closing occurred on

---

[1] October 7, 2004, was a Thursday.  Under Regulation Z, Saturday is a business day.  12 C.F.R. § 226.19(a).  At trial, Plaintiff's counsel argued that it is not clear that Saturday is a business day and that, therefore, the notice violated Regulation Z because Plaintiff could not be expected to know that Saturday is a business day, making the notice confusing and misleading.  (*See* Trial Tr. 9:17-18; 60:2-5.)  Although at least one court has entertained this argument, *see Aubin*, 565 F. Supp. at 397, accepting it would simply inject confusion into Regulation Z.  Treating Saturday as a non-business day for borrowers could mean that creditors and borrowers could be subject to different counting standards:  creditors would be responsible for counting Saturdays as business days while borrowers would not.

October 6, 2004, was not credible. The credible evidence presented by Defendants established that there was a change in the dates of the closing. That change provides a reasonable explanation of how the erroneous typewritten dates of October 6, 2004, and October 9, 2004, made their way into the Notice of Rescission.

20. Defendants introduced evidence regarding Ameribanq's maintenance of reasonable procedures under § 1640(c). Ameribanq employee Frances Bedekovic testified about the general procedures employed by Ameribanq to ensure compliance with Regulation Z and accuracy in the loan documents. (Trial Tr. 204:2 to 208:3; 209:22 to 210:7.) Those procedures included use of specialized software to generate the loan documents (*id.* at 204:7 to 205:10), use of Mortgage Resource Network to perform a pre-closing audit of the documents (*id.* at 205:11-24), and use of Mortgage Resource Network to perform a post-closing audit of the closing documents (*id.* at 210:1-4). Bedekovic also testified about specific steps that would have been taken with regard to the Notice of Rescission. (*Id.* at 210:12 to 211:3.) Mortgage Resource Network documented its review of the post-closing documents in a Funding Authorization Form. (Ex. D-25; *see also* Trial Tr. 209:10-25.) That form indicates that the closing documents, including the Notice of Rescission, were reviewed after the closing. (*See* Ex. D-25.) Thus, the Notice of Rescission was prepared by a software program designed to produce documents in compliance with Regulation Z, it was audited before the closing, and it was audited after the closing. The Notice of Rescission contained a mistake despite the existence of these procedures, which were reasonably calculated to avoid such a mistake.

21. We conclude that these procedures served as "a safety catch or rechecking mechanism" sufficient to satisfy 15 U.S.C. 1640(c). *See Molenbeek v. W. Mich. Auto & Truck*

*Outlet, Inc.*, No. 00-286, 2001 U.S. Dist. LEXIS 3433, at *13 (W.D. Mich. Mar. 15, 2001) (quoting *Gallegos v. Stokes*, 593 F.2d 372, 376 (10th Cir. 1979)) (brackets omitted); *see also Davison v. Bank One Home Loan Servs.*, No. 01-2511, 2003 U.S. Dist. LEXIS 514, at *27 (D. Kan. Jan. 13, 2003) (determining that in promulgating 15 U.S.C. § 1640(c), "'Congress required more than just a showing that a well-trained and careful clerk made a mistake'" and that "'a showing that the first well-trained clerk's [action] was checked by a second well-trained clerk or that one clerk [employed a procedure to double check his or her own action] would satisfy Congress' requirements'" (quoting *Mirabal v. Gen. Motors Acceptance Corp.*, 537 F.2d 871, 878-79 (7th Cir. 1976), *overruled on other grounds by Brown v. Marquette Sav. & Loan Ass'n.*, 686 F.2d 608, 614 (7th Cir. 1982)) (alterations in original)).  Therefore, the bona fide error exception would apply even if the mistake on the Notice of Rescission were a violation of TILA or Regulation Z.

22.     Accordingly, Defendants are entitled to judgment in their favor on the the Notice of Right to Recision claim.

> *(2)     Disclosure of Finance Charge*

23.     TILA requires that creditors in home mortgage transactions disclose the finance charge to the borrower.  *See* 15 U.S.C. § 1638(a)(3)-(8), (11); *see also id.* §§ 1605, 1631.  Under TILA, the finance charge is "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit . . . ."  15 U.S.C. § 1605(a).  Regulation Z further defines the term "finance charge" as "the cost of consumer credit as a dollar amount.  It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor

as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4(a). The finance charge excludes "any charge of a type payable in a comparable cash transaction." *Id.* Regulation Z provides creditors with elaborate guidance in determining what must be disclosed to borrowers. *See generally id.* § 226.4.

24.     Over the course of this litigation, Plaintiff has raised several issues regarding the adequacy of Ameribanq's disclosure of the finance charge. However, Plaintiff's allegations remained unfocused through the trial. Therefore, the best way to analyze these issues is to examine what fees were actually disclosed and what fees Plaintiff argues should have been disclosed. In order to do this, we look to the Settlement Statement and the Itemization of Prepaid Finance Charge. (Exs. D-6, P-11.) The Settlement Statement lists on numbered lines the closing fees in the transaction. (*See* Ex. D-6.) The Itemization of Prepaid Finance Charge disclosed to Plaintiff what fees were part of the finance charge. (*See* Ex. P-11.) Ameribanq disclosed ten of the fees listed on the Settlement Statement (lines 801, 805, 806, 808, 809, 810, 811, 901, 1101, and 1102) in the Itemization of Prepaid Finance Charge. Plaintiff argues that seven fees listed on the Settlement Statement (lines 803, 804, 807, 1108, 1103, 1104, and 1111) should have been disclosed but were not. (Pl.'s Pretrial Mem. at 4.) We will assess, line by line, the adequacy of the disclosure.

25.     Line 801 of the Settlement Statement lists $6528.00 for a Loan Origination Fee. That amount was properly included in the calculation and disclosure of Plaintiff's finance charge. *See* 12 C.F.R. § 226.4(b)(3) (defining "[p]oints, loan fees, assumption fees, finder's fees, and similar charges" as part of the finance charge); *Abel v. Knickerbocker Realty Co.*, 846 F. Supp. 445, 448 (D. Md. 1994) (finding that the defendant-creditor's failure to include the origination

fee in the finance charge violated TILA).

26.     Line 803 of the Settlement Statement lists a $50.00 appraisal fee.  That amount

was properly excluded from the calculation and disclosure of Plaintiff's finance charge.  *See* 15

U.S.C. § 1605(e)(5) (excluding appraisal fees from the finance charge in "any extension of credit

secured by an interest in real property"); 12 C.F.R. § 226.4(c)(7)(iv) (excluding "[p]roperty

appraisal fees or fees for inspections to assess the value or condition of the property if the service

is performed prior to closing, including fees related to pest infestation or flood hazard

determinations" from the finance charge); *Chiles v. Ameriquest Mortg. Co.*, 551 F. Supp. 2d 393,

397 (E.D. Pa. 2008) (noting that "TILA does not require a lender to list the price of property

appraisal fees" if those fees are bona fide and reasonable in amount).  Plaintiff's testimony that

the Ameribanq representative, Jared Weisfeld, was supposed to pay the appraisal fee was not

credible.  (*See* Trial Tr. 42:6-9; 44:1-3.)  Plaintiff offered no affirmative evidence that the fee

listed in line 803 of the Settlement Statement was for anything other than an appraisal service

performed by Ameribanq prior to closing for the purpose of assessing the value or condition of

the property.  Nor did Plaintiff offer any evidence that the $50.00 fee was not "bona fide and

reasonable in amount."  *See* 12 C.F.R. § 226.4(c)(7) (excluding real estate related fees from the

finance charge so long as those fees are "bona fide and reasonable in amount").  Since there is

nothing in the record to suggest that the appraisal fee in line 803 should have been disclosed as

part of the finance charge or that the amount was not bona fide and reasonable, Plaintiff has not

met her burden to establish that the appraisal fee should have been disclosed.

27.     Line 804 of the Settlement Statement lists $35.00 for a credit report.  That amount

was properly excluded from Plaintiff's finance charge.  *See* 15 U.S.C. § 1605(e)(6) (excluding

credit reports from the finance charge in "any extension of credit secured by an interest in real property"); 12 C.F.R. § 226.4(c)(7)(iii) (excluding "[n]otary and credit report fees" from the finance charge); *Seldon v. Home Loan Servs.*, No. 07-4480, 2009 U.S. Dist. LEXIS 68246, at *27 & n.7 (E.D. Pa. Aug. 5, 2009) (noting that credit report fees are among those excluded from disclosure in the finance charge in transactions secured by real property). Plaintiff's testimony about her understanding of the credit report fee was inconsistent. (*Compare* Trial Tr. 42:12-13 ("Q: And do you know what [the credit report fee in line 804 is] for or what that is? A: No."), *with id.* at 107:3-6 ("Q: All right. 804, credit report. Did you understand you were paying for that? A: For my credit report to be ran [sic]. Mark [the mortgage broker] explained to me he had to get it, yes.")) In any event, Plaintiff offered no evidence that the credit report fee was not bona fide and reasonable. *See* 12 C.F.R. § 226.4(c)(7). Even though Defendants did not bear the burden of proof, Defendants introduced evidence that the $35.00 fee was reasonable. (*See id.* at 226:12-14.) The $35.00 credit report was properly left out of the finance charge.

28.     Line 805 of the Settlement Statement lists $150.00 for underwriting. (Ex. D-6.) That amount was properly included in the finance charge. *See* 12 C.F.R. § 226.4(b)(3); *Romaker v. Crossland Mortg. Corp.*, No. 94-3328, 1995 U.S. Dist. LEXIS 22252, at *9 (N.D. Ill. Nov. 3, 1995) ("Both the tax service fee and the underwriting fee are usually fees which are required to be included as part of the finance charge.").

29.     Line 806 of the Settlement Statement lists a $80.00 tax service fee to Ameribanq. (Ex. D-6.) That amount was properly included in the finance charge. *See* 12 C.F.R. § 226.4(a)-(b); *Romaker*, 1995 U.S. Dist. LEXIS 22252, at *9.

30.     Line 807 of the Settlement Statement lists a $18.50 flood certification fee to

Ameribanq.  That amount was properly excluded from the finance charge.  *See* 15 U.S.C.

§ 1605(e)(5) (excluding flood hazard inspections from the finance charge in "any extension of

credit secured by an interest in real property"); 12 C.F.R. § 226.4(c)(7)(iv) (excluding "[p]roperty

appraisal fees or fees for inspections . . . including fees related to . . . flood hazard

determinations" from the finance charge); *Johnson v. Know Fin. Group* [*Johnson II*], No. 03-

378, 2004 U.S. Dist. LEXIS 9916, at *18-19 (E.D. Pa. May 27, 2004) (noting that flood

certification fees are "ordinarily excluded from the finance charge").  Plaintiff offered no

evidence that suggests that the flood certification fee was not bona fide and reasonable in

amount.  *See* 12 C.F.R. § 226.4(c)(7).  Nor did she offer any evidence that the fee was for

anything other than a flood hazard determination that was performed prior to closing.

Accordingly, it was properly excluded from the finance charge.

31.     Line 808 of the Settlement Statement lists a $250.00 processing fee to Ameribanq.

That amount was properly included in the finance charge.  *See* 12 C.F.R. § 226.4(b)(3); *Jefferies*

*v. Ameriquest Mortg. Co.*, 543 F. Supp. 2d 368, 381 (E.D. Pa. 2008) (noting that lender's

processing fee must be disclosed).

32.     Line 809 of the Settlement Statement lists a $310.00 administration fee to

Ameribanq.  That amount was properly included in the finance charge.  *See* 12 C.F.R.

§ 226.4(b)(3); *Jefferies*, 543 F. Supp. 2d at 381 (noting that lender's administration fee must be

disclosed).

33.     Line 810 of the Settlement Statement lists a $35.00 wire fee to Ameribanq, which

was a charge for the service of wiring the funds from the title company to the bank.  (*See* Trial

Tr. 230:7-10.)  That fee was included in Plaintiff's finance charge.  Defendants argue that the

23

wire fee was appropriately disclosed under 12 C.F.R. § 226.4(a)(1), which includes certain fees charged by third parties in the finance charge.  Section 226.4(a)(1) provides that

> [t]he finance charge includes fees and amounts charged by someone other than the creditor, unless otherwise excluded under this section, if the creditor:
> (i) requires the use of a third party as a condition of or an incident to the extension of credit, even if the consumer can choose the third party; or
> (ii) retains a portion of the third-party charge, to the extent of the portion retained.

*Id.*  The wire fee is listed as being paid to Ameribanq, which was the creditor, seemingly obviating the applicability of the section.  However, the parties did not introduce sufficient evidence at trial for us to ascertain which, if either, of the subsections of § 226.4(a)(1) would apply to the wire fee.  Defendants offered testimony that wire fees are customarily included in the finance charge.  (*See id.* at 230:14-16.)  Plaintiff does not contend that the wire fee should not have been disclosed in the finance charge.  Since the matter is not contested and since we do not have sufficient facts to ascertain the exact nature of the wire fee, we will treat it as properly disclosed.

34.     Line 811 of the Settlement Statement lists a $75.00 appraisal fee to Landsafe Appraisal.  That fee was included in the finance charge.  As noted above, § 226.4(c)(7) of Regulation Z provides for the exclusion of real estate related fees from the finance charge so long as they are bona fide and reasonable in amount.  Appraisal fees are real estate related fees that do not need to be disclosed so long as they "assess the value or condition of the property if the service is performed prior to closing."  12 C.F.R. § 226.4(c)(7)(iv).  We have determined that the $50.00 appraisal fee listed in line 803 of the Settlement Statement was properly excluded from the finance charge because Plaintiff offered no evidence that the fee was not bona fide and reasonable in amount and that the fee was not for an appraisal prior to the closing of the deal.

For similar reasons, we determine that the appraisal fee listed in line 811 was properly included in the finance charge. Although Defendant introduced evidence suggesting that the appraisal fee to Landsafe was bona fide and reasonable in amount (*see* Trial Tr. 231:16-21), neither party introduced any evidence regarding the timing of the appraisal. There is thus no evidence that the appraisal occurred before the closing and should have been excluded from the finance charge under Regulation Z, § 226.4(c)(7)(iv).

35. Line 901 of the Settlement Statement lists a $1118.20 charge for prepaid interest. That amount was properly included in the finance charge. 15 U.S.C. § 1605(a)(1) (listing interest as an example of a fee included in the finance charge); 12 C.F.R. § 226.4(b)(1) (same); *In re Strong*, 356 B.R. 121, 153 n.28 (Bankr. E.D. Pa. 2004) ("[T]he finance charge includes prepaid interest pursuant to [Regulation Z].")), *aff'd*, No. 04-4699, 2005 U.S. Dist. LEXIS 12136 (E.D. Pa. June 21, 2005).

36. Lines 1101 to 1104, 1108, 1111, and 1112 list fees paid to Rockwood Settlement Group, Inc. Lines 1101 and 1112 of the Settlement Statement respectively list a $195.00 settlement or closing fee and a $50 courier fee. These fees were included in the calculation of the finance charge. (Ex. P-11.) Lines 1102 to 1104, 1108 and 1111 respectively list a $125.00 abstract or title search fee, a $380.00 title examination fee to Rockwood, a $100.00 title insurance binder fee, a $654.00 title insurance fee to Rockwood, and a $50.00 fee for judgments. These fees were not included in the calculation of the finance charge.

37. Plaintiff argues that the fees that she paid to Rockwood were unreasonable and that they should have been disclosed in the finance charge. (Trial Tr. 22:12-14; 139:12-18.) We do not understand Plaintiff to be arguing that the title insurance fees were not bona fide. A fee is

not bona fide if the services for which the fee is charged were not in fact performed. *See Brannam v. Huntington Mortg. Co.*, 287 F.3d 601, 606 (6th Cir. 2002). Nowhere does Plaintiff contend that the fees to Rockwood, which are listed on her HUD-1 form, were for services that were not performed.

38. TILA excludes title insurance and related fees from the finance charge. *See* 15 U.S.C. § 1605(a) ("The finance charge shall not include fees and amounts imposed by third party closing agents (including settlement agents, attorneys, and escrow and title companies) if the creditor does not require the imposition of the charges or the services provided and does not retain the charges."); *id.* § 1605(e)(1) (providing that certain fees "shall not be included in the computation of the finance charge," including "[f]ees or premiums for title examination, title insurance, or similar purposes").

39. Regulation Z provides that title insurance fees that are not bona fide or reasonable must be disclosed in the finance charge. 12 C.F.R. § 226.4(c)(7) (excluding "[f]ees for title examination, abstract of title, title insurance, property survey, and similar purposes" from the finance charge); *McCutcheon v. Am.'s Servicing Co.*, 560 F.3d 143, 147 (3d Cir. 2008) ("[T]itle insurance is treated as a finance charge if it is not 'bona fide and reasonable in amount.'" (quoting 12 C.F.R. § 226.4(c)(7))).

40. Courts in this circuit "assess the reasonableness of title insurance premiums through comparison of the disputed charges with the prevailing rates of the industry in the locality." *In re Madera*, No. 07-1396, 2008 U.S. Dist. LEXIS 25864, at *30 (E.D. Pa. Mar. 27, 2008) (citing *Jones v. Aames Funding Corp.*, No. 04-4799, 2006 WL 2845689, at *5 (E.D. Pa. Mar. 8, 2006)), *amended by* 388 B.R. 586, *aff'd*, 586 F.3d 228 (3d Cir. 2009). Courts in this

district look to the Manual of the Title Insurance Rating Bureau of Pennsylvania (the "Manual") to assess the reasonableness of title insurance fees in transactions occurring in Pennsylvania. *See id.* at \*31 (citing *Johnson II*, 2004 U.S. Dist. LEXIS 9916, at \*22 & n.6; *Davis*, 2007 U.S. Dist. LEXIS 83307, at \*16). *But see Johnson v. Banc One Acceptance Corp.* [*Johnson I*], 278 F. Supp. 2d 450, 456 (E.D. Pa. 2003) (Van Antwerpen, J.) (observing that "it is not clear to us that the Manual of the Title Insurance Rating Bureau of Pennsylvania is binding on [lenders]").[2]

41. Plaintiff's loan transaction occurred in October 2004. In 2005, the Title Insurance Rating Bureau of Pennsylvania amended the Manual. Because there is no indication that the 2005 amendments were intended to be retroactive, we apply the 2003 version of the Manual.

42. Plaintiff contends that she was charged the basic rate for title insurance when she was, in fact, entitled to a discounted rate because her loan was a refinance transaction. (*See, e.g.*, Trial Tr. 139:10 to 140:9.) The Manual provides discounted rates for reissue and refinance

---

[2] We understand why Judge Van Antwerpen would question whether the Manual is binding on lenders. It governs the conduct of Pennsylvania title insurance providers, not the conduct of lending institutions. Determining that one entity's (potentially unintentional) violation of a state quasi-regulation can constitute a violation of federal consumer protection laws by another entity seems unfair. Nevertheless, this is the effect of TILA's broad reach. Although TILA explicitly excludes payments to title insurance companies from the finance charge, Regulation Z interprets TILA's language as having an implicit reasonableness requirement. In order to assess reasonableness, courts in this district have chosen to apply a "prevailing rate in the locality" standard, and by extension reject a national or objective standard. *See, e.g.*, *Davis*, 2007 U.S. Dist. LEXIS 83307, at \*16 (quoting *Jones v. Aames Funding Corp.*, No. 04-4799, 2006 U.S. Dist. LEXIS 11119, at \*15 (E.D. Pa. Mar. 8, 2006)); *cf. Madera v. Ameriquest Mortg. Co. (In re Madera)*, 586 F.3d 228, 233 n.6 (3d Cir. 2009) (interpreting the term "prevailing rate" to be synonymous with "reasonable"). Since the Manual sets rates in Pennsylvania, it is, for lenders operating in Pennsylvania, the measure of a rate's reasonableness for purposes of TILA compliance. Thus, while the Defendants here offered evidence that the fees listed in Lines 1101 to 1104, 1108, 1111, and 1112 were objectively reasonable (*see* Trial Tr. 231:22 to 235:18), that evidence was not based on what is reasonable in Pennsylvania (*see id.* at 238:11-13), and Defendants' reliance on it was misplaced.

transactions.  For mortgages of up to and including $2 million, the reissue rate is 90% of the basic rate.  *See* 2003 Manual §§ 5.3, 5.50.  Section 5.3 of the Manual sets the standard for the reissue rate:

> A purchaser of a title insurance policy shall be entitled to purchase this coverage at the reissue rate if the real property to be insured is identical to or is part of real property insured 10 years immediately prior to the date the insured transaction closes when evidence of the earlier policy is produced notwithstanding the amount of coverage provided by the prior policy.

(*Id.* § 5.3.)  Section 5.6 of the Manual sets the standard for the refinance rate:

> When a refinance or substitution loan is made within 3 years from the date of closing of a previously insured mortgage or fee interest and the premises to be insured are identical to or part of the real property previously insured and there has been no change in the fee simple ownership, the Charge shall be 80% of the reissue rate [i.e., by the associative property of multiplication, 72% of the basic rate]. . . .

(*Id.* § 5.6.)  Thus, under section 5.6 of the Manual, borrowers in refinance loan transactions are entitled to a discounted rate if the transaction satisfies three conditions:  (1) a refinance or substitution loan is made within 3 years from the date of closing of a previously insured mortgage; (2) the premises to be insured are identical to or part of the real property previously insured; and (3) there has been no change in the fee simple ownership.

  43. The parties contest whether Rockwood or Ameribanq had an obligation to provide Plaintiff with the refinance rate.  The disagreement centers on whether the Manual imposed on Plaintiff, as the borrower, the burden of providing evidence to Rockwood or to Ameribanq that she had title insurance on her previous mortgage.  Defendants argue that Plaintiff bore the burden of providing evidence demonstrating that she was entitled to the refinance rate.  Plaintiff contends that she was not required to furnish proof of a prior policy because Ameribanq had an obligation to ascertain whether Plaintiff was eligible for the refinance rate.  This dispute is not a

matter of settled law. Several district court and bankruptcy court decisions, and at least one

Third Circuit panel decision, have held that a borrower must offer evidence that the lender knew

or should have known at the time of the transaction that the plaintiff was entitled to the refinance

rate.[3] These decisions were challenged recently in the case of *Escher v. Decision One Mortgage*

*Co.*, 417 B.R. 245, 252-58 (E.D. Pa. 2009), *appeal pending*, No. 09-4242 (3d Cir. 2009).

      44.     In *Escher*, the plaintiffs sued the defendants in bankruptcy court for violating

TILA by not disclosing overcharges in title insurance in the finance charge. There was no

dispute that the plaintiffs were charged the basic rate when they qualified for the discounted

refinance rate. The sole issue was whether was "the borrowers had the burden of providing

evidence to the lender, at or prior to closing, that they had title insurance in connection with the

previous mortgage, or whether it is the lender's obligation to ascertain at closing that the

borrowers had preexisting title insurance." *Id.* at 253. The bankruptcy court determined that the

plaintiffs, as borrowers, had the burden of establishing that they were entitled to the lower rate at

the time of closing. On appeal, the district court held that borrowers do not have that burden and

---

[3] *Ricciardi v. Ameriquest Mortg. Co.*, 164 F. App'x 221, 226 (3d Cir. 2006) (not precedential); *In re Madera*, 2008 U.S. Dist. LEXIS 25864, at *36; *Chiles v. Ameriquest Mortg. Co.*, 551 F. Supp. 2d 393, 397 (E.D. Pa. 2008); *Davis*, 2007 U.S. Dist. LEXIS 83307, at *18 n.6; *In re Fields*, No. 06-1753, 2006 U.S. Dist. LEXIS 52934, at *11 (E.D. Pa. July 31, 2006), *aff'd on other grouds*, 283 F. App'x 897, 899 (3d Cir. 2008) (not precedential); *Jones*, 2006 U.S. Dist. LEXIS 11119, at *18-19; *see also In re Escher*, 369 B.R. 862, 866 (Bankr. E.D. Pa. 2007), *vacated in part by Escher v. Decision One Mortg. Co.*, 08-4719, LLC, 2009 U.S. Dist. LEXIS 89646 (E.D. Pa. Sept. 29, 2009); *In re Glauser*, 365 B.R. 531, 536-39 (Bankr. E.D. Pa. 2007). We note that there are several pending lawsuits against title insurers alleging failure to provide borrowers with the appropriate reissue or refinance rate under the Manual. *See, e.g.*, *Alberton v. Commw. Land Title Ins. Co.*, No. 06-3755, 2010 U.S. Dist. LEXIS 6650, at *2-4 (E.D. Pa. Jan. 27, 2010); *McDuffie v. Stewart Title Guar. Co.*, No. 08-5038, 2009 U.S. Dist. LEXIS 67116, at *3-5 (E.D. Pa. Mar. 30, 2009); *White v. Conestoga Title Ins. Co.*, 982 A.2d 997, 1001 (Pa. Super. Ct. 2009). None of these courts have addressed the issue of whether the borrower or the lender is responsible for ensuring that the borrower receives the refinance rate.

that the bankruptcy court had applied the wrong standard. The district court based its decision on two grounds. The first was that the difference in language between section 5.3 and section 5.6—i.e., that section 5.3 explicitly places the burden on borrowers, while section 5.6 is silent on the issue—was an indication that borrowers in refinance transactions do not have that burden under the canon of statutory construction that "where one section of a statute does not include a specific term used elsewhere in the statute, it is presumed that the omission was intentional and the drafters did not intend the missing language to apply." *Id.* at 256 (citing *Office of the Comm'r of Baseball v. Markell*, 579 F.3d 293, 301-02 (3d Cir. 2009)). The second was a policy determination that lenders are better suited than borrowers to ensure a fair outcome, which the district court based on the application of "common sense [to] the circumstances of the typical refinancing transaction." *See id.* at 258. The district court observed that borrowers are unlikely to know that they are entitled to a discounted rate, rendering unreasonable the expectation that they would produce evidence of a prior policy at closing. By contrast, "most lenders would not extend credit secured by a mortgage without title insurance," so placing the burden on them is reasonable. *See id.*

45. The district court departed from the existing case law on this issue because the other cases had mechanically applied the standard without critically analyzing its basis in law or in the plain language of the Manual. We find the analysis of the District Court persuasive. . Accordingly, we adopt that standard here.

46. Plaintiff introduced evidence showing that she satisfied the three requirements set forth in section 5.6 of the Manual. (*See* Exs. P-1, P-1A.) She was thus entitled to the discounted refinance rate.

47.     Determining what Plaintiff was actually charged and what she should have been charged is complicated by the fact that the HUD-1 form contemplates that title charges will be itemized separately.  Pennsylvania law and the Manual, however, regulate aggregate charges by title insurers.  Section 1.6 of the Manual specifies that the term "charge" is "the premium, the examination and settlement or closing fees, and every other charge, whether denominated premium or otherwise, made by a title insurance company . . . to an applicant for insurance, for any policy or contract for the issuance of . . . title insurance."  (*See* Manual § 1.6 (adopting the definition of "fee" set forth in section 701 of Pennsylvania's Insurance Company Law of 1921, 40 Pa. Cons. Stat. § 910-1).)  Thus, under the Manual's broad definition, all the fees listed in Lines 1101 to 1104, 1108, 1111, and 1112, which total $1554, are the title insurance charge.

48.     For a $217,600 loan like Plaintiff's, the basic title insurance rate was $1446.75.  (*See* Manual § 5.50.)  The reissue rate was $1302.08, and the refinance rate was $1041.66.  (*See id.* §§ 5.3. 5.6, 5.50.)  Since the amount charged for title insurance above the reasonable rate must be disclosed in the finance charge, Ameribanq had to disclose the difference between $1554 and $1041.66 (i.e., $512.34).  As note above, Ameribanq included Lines 1101 ($195 settlement or closing fee) and 1112 ($50 courier fee) in the finance charge.  Thus the finance charge is understated by $267.34.

49.     TILA authorizes the Federal Reserve Board "to permit tolerances for numerical disclosures other than the annual percentage rate so that such tolerances are narrow enough to prevent such tolerances from resulting in misleading disclosures or disclosures that circumvent the purposes" the statute.  15 U.S.C. § 1631(d).  Regulation Z provides that the finance charge in mortgage transactions shall be treated as accurate if it "(i) is understated by no more than $100;

or (2) greater than the amount required to be disclosed." 12 C.F.R. § 226.18(d)(1). Accordingly, the $267.37 overcharge rendered the disclosure of the finance charge inaccurate. We must therefore assess the remedies that TILA affords Plaintiff.

### C.    TILA Remedies

50.    TILA provides borrowers with both legal and equitable remedies. Depending on the circumstances, an aggrieved borrower may obtain damages, rescission of the loan, or both. Plaintiff has requested both legal and equitable relief.

*(1) Damages*

51.    TILA provides for actual and statutory damages. 15 U.S.C. §§ 1640(a)(1), (2); *see also id.* § 1635(g) (providing that courts may award rescission and damages).

52.    Plaintiff is not entitled to actual damages because she did not establish at trial that she detrimentally relied on the under-disclosure of the title insurance fee or that her detrimental reliance caused her to enter into the transaction. *See Vallies v. Sky Bank*, 591 F.3d 152, 156 (3d Cir. 2009) ("[A] showing of detrimental reliance is necessary to recover actual damages for TILA disclosure violations."), *aff'g* 583 F. Supp. 2d 687, 690 (collecting cases).

53.    For mortgage transactions like Plaintiff's, TILA prescribes statutory damages for violations in the form of either "twice the amount of any finance charge in connection with the transaction" or "not less than $ 200 or greater than $ 2,000." 15 U.S.C. § 1640(a)(2)(A).[4] The

---

[4] In 2008, Congress increased the statutory damages range to $400 to $4000. *See* The Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, § 2502, 122 Stat. 2654, 2857. Prior to the amendment, the statutory damages range was $200 to $2000. The language of the Housing and Economic Recovery Act does not reflect a congressional intent for the increase in the statutory damage range to apply retroactively. Since Ameribanq's violation took place before the 2008 TILA amendments, the pre-2008 statutory damages govern. *See generally Landgraf v. Usi Film Prods.*, 511 U.S. 244, 265–85 (1994).

TILA violation at issue here is insignificant. Moreover, it arises out of a technicality that was neither foreseeable nor directly attributable to an affirmative action by any Defendant. Rather, it arose from the conduct of a third party that was unaffiliated with Ameribanq. (*See* Trial Tr. 206:12-14.) Likewise, it does not appear to have been material to the transaction. Given the 2005 amendments to the Manual and the lack of TILA cases in this district regarding title insurance, it is unlikely that this violation poses a recurring threat that a high statutory damages award would motivate lenders to avoid. Accordingly, a statutory damages award of $200 is appropriate.

54. There are three named Defendants in this action: Ameribanq, Countrywide, and Bank of New York. As assignees of the mortgage, Countrywide and Bank of New York are afforded protections against civil liability under TILA, which permits assignees to be held liable "only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement, except where assignment was involuntary." 15 U.S.C. § 1641. Plaintiff did not establish that the assignment of her loan was involuntary. She also did not establish that the understatement of the finance charge was apparent on the face of the disclosure statement. TILA provides that "a violation apparent on the face of the disclosure statement includes, but is not limited to (1) a disclosure which can be determined to be incomplete or inaccurate from the face of the disclosure statement or other documents assigned, or (2) a disclosure which does not use the terms required to be used by this title." *Id.* Neither of the enumerated factors is implicated here. *See McCutcheon*, 560 F.3d 146 (describing with approval the district court's determination that the defendant-assignee was shielded from liability by § 1641 where the lender failed to provide the borrower with the refinance rate for title insurance). Nor did Plaintiff establish the

existence of any other facts that would weigh in favor of holding Countrywide or Bank of New York civilly liable.

55.     Since neither Countrywide nor Bank of New York can be held civilly liable, we will enter a judgment in the amount of $200 against Ameribanq and in favor of Plaintiff.

*(2) Rescission*

56.     As discussed above, TILA permits borrowers three days to unilaterally rescind a consumer credit transaction in which the lender takes a security interest in the borrower's principal dwelling.  *See* 15 U.S.C. § 1635(a); 12 C.F.R. § 226.23(a).  The three-day rescission period is extended to three years when the lender fails to make a material disclosure.  *See* 15 U.S.C. § 1635(f).  Such a failure renders a transaction voidable, but it does not automatically void the transaction.  *Bertram v. Beneficial Consumer Disc. Co.*, 286 F. Supp. 2d 453, 459 (M.D. Pa. 2003) (citing *Large v. Conseco Fin. Servicing Corp.*, 292 F.3d 49, 55 (1st Cir. 2002)).  To make a transaction void, an aggrieved borrower must invoke rescission in accordance with the procedures set forth in TILA and Regulation Z.  *See* 15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d).

57.     Inaccuracies in the finance charge constitute a failure to make a material disclosure by the lender.  *See* 15 U.S.C. § 1635(f); 12 C.F.R. § 226.23(g); *In re Porter*, 961 F.2d at 1073; *Johnson II*, 2004 U.S. Dist. LEXIS 9916, at *10.  In most situations, the finance charge is considered accurate if it is not overstated by more than one-half of one percent (0.5%) of the "face amount of the note"—for instance, $1088 where, as here, the mortgage is for $217,600. *See* 12 C.F.R. § 226.23(g)(1).  However, the tolerance for error in the finance charge drops to $35 dollars when there has been an "initiation of foreclosure on the [borrower's] principal dwelling that secures the credit obligation . . . ."  *Id.* § 226.23(h); 15 U.S.C. § 1635(i).  On

October 10, 2006, Bank of New York commenced a foreclosure action on the Property in the Court of Common Pleas of Delaware County to foreclose on the Property. (Ex. P-15; *see also* Trial Tr. 17:17-21.)

58. Defendants argue that the $35 threshold does not apply in this action because the $35 threshold is meant only to be an affirmative defense to foreclosure actions and that since Plaintiff is asserting her right to rescission affirmatively, the threshold does not apply. Defendants cite no cases, statutes, or legislative history to support their reading of TILA and Regulation Z. Instead they cite a law review article that baldly asserts that "[w]hen a borrower wants to use rescission *as a defense to foreclosure*, the tolerance for an under-disclosed finance charge drops to $35." (Doc. No. 80 ¶ 227 (paraphrasing Elwin Griffith, *Truth in Lending – The Right of Rescission, Disclosure of the Finance Charge, and Itemization of the Amount Financed in Closed-end Transactions*, 6 Geo. Mason L. Rev. 191, 196 (1998)) (emphasis added by Defendants).) We reject Defendants' argument. It contradicts the clear language of TILA and Regulation Z, which both state that the $35 threshold governs "after the initiation" of the foreclosure process. *See* 15 U.S.C. 1635(i)(2); 12 C.F.R. § 226.23(h)(2); *see also Glucksman v. First Franklin Fin. Corp.*, 601 F. Supp. 2d 511, 513 (E.D.N.Y. 2009) (denying the defendants' motion to dismiss because the plaintiff had stated a claim where the defendants had commenced a foreclosure action and the alleged understatement of the finance charge was greater than $35); *Oscar*, 2006 U.S. Dist. LEXIS 6410, at *13 (construing the $35 threshold to apply where "the mortgage loan on the consumer's principal dwelling is in foreclosure"); *cf. McCutcheon*, 560 F.3d at 149 (observing that since the defendant did not follow through with its threat to commence a foreclosure action, the $35 threshold did not apply). Nothing in the text of the

statute or regulation suggests that the $35 threshold is available only as an affirmative defense. Reading such a requirement into TILA and Regulation Z would not only be improper, it would also construe them in favor of the lender in direct contravention of the mandate that TILA and its implementing regulation are to be construed in favor of borrowers. *See, e.g.*, *Smith*, 898 F.2d at 898.

59.     Unlike damages, TILA does not exempt assignees from a borrower's right to rescission. 15 U.S.C. § 1641(c) ("Any consumer who has the right to rescind a transaction under [15 U.S.C. § 1635] may rescind the transaction as against any assignee of the obligation."); *Carmen v. Metrocities Mortg.*, No. 08-2729, 2010 U.S. Dist. LEXIS 7984, at *18 (D.N.J. Feb. 1, 2010) (finding that the plaintiff's right to rescind extended to the assignee of the plaintiff's mortgage). Thus, Bank of New York's assignee status does not protect it from rescission.

60.     Because Bank of New York commenced a foreclosure on the Property, the $35 threshold applies. And since the finance charge was understated by $267.37, there was a material violation of TILA, extending Plaintiff's ability to rescind the transaction from three days to three years. *See* 15 U.S.C. § 1635(f). On March 7, 2005, Plaintiff's counsel sent a letter informing of Plaintiff's intent to rescind. (Ex. P-6.) On April 28, 2005, Plaintiff commenced this action. (*See* Doc. No. 1.) Both of these actions were undertaken within three years of the transaction and both were sufficient to demonstrate Plaintiff's intent to rescind. *See, e.g.*, *Robinson v. Holiday Universal, Inc.*, No. 05-5725, 2006 U.S. Dist. LEXIS 65082, at *29 (E.D. Pa. Sept. 12, 2006) ("[T]he filing of a complaint seeking declaratory relief and recission [sic] is sufficient to demonstrate the requisite intention to rescind." (citations omitted)). Just as a material violation of TILA does not void a transaction, Plaintiff's invocation of her right to rescind does not

automatically effect a rescission of the transaction.

61.    Rescission is an equitable remedy whose goal is "to return the parties most nearly to the position they held prior to entering into the transaction." *Williams v. Homestake Mortg. Co.*, 968 F.2d 1137, 1140 (11th Cir. 1992); *Parker v. Long Beach Mortg. Co.*, 534 F. Supp. 2d 528, 537 n.9 (E.D. Pa. 2008) ("The equitable goal of rescission under TILA is to restore the parties to the 'status quo ante.'" (citations omitted)).  Under TILA and Regulation Z, when a borrower "exercises his right to rescind . . . , he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission."  15 U.S.C. § 1635(b); 12 C.F.R. 226.23(d)(1).  The borrower must provide the lender with a notice of the right to rescind, and within 20 days of receiving notice, the lender must "return to the [borrower] any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction."  15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d)(2).  After the lender has returned the specified funds and terminated its security interest, the borrower must "tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value."  15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(3).

62.    As the Eleventh Circuit recognized in *Williams v. Homestake Mortgage Co.*, "[t]he sequence of rescission and tender set forth in § 1635(b) is a reordering of common law rules governing rescission."  968 F.2d at 1140 (observing that "[u]nder common law rescission, the rescinding party must first tender the property that he has received under the agreement before the contract may be considered void") (citation omitted).  Reordering the common-law

rules governing rescission has the twofold effect of placing the borrower in a stronger bargaining position than he would occupy under the common law and serving as "an important enforcement tool, insuring creditor compliance with TILA's disclosure requirements." *Id.* The reordering of the rules does not, however, alter the equitable nature of the remedy or tie courts' hands in ensuring an equitable result. *See, e.g.*, *Dawson v. Thomas (In re Dawson)*, 411 B.R. 1, 41 (Bankr. D.D.C. 2008) (determining that "despite being statutorily granted," the rescission remedy in TILA, "'remains an equitable doctrine subject to equitable considerations'" (quoting *Brown v. Nat'l Permanent Fed. Sav. & Loan Ass'n*, 683 F.2d 444, 447 (D.C. Cir. 1982))).

63.     TILA's rescission remedy is meant to protect borrowers. It is not meant to provide borrowers with a free house or other financial windfall. To that end, courts have the ability to condition rescission on the borrower's tender of the loan proceeds to the lender. *Am. Mortg. Network, Inc. v. Shelton*, 486 F.3d 815, 820 (4th Cir. 2007); *Yamamoto v. Bank of New York*, 329 F.3d 1167, 1168 (9th Cir. 2003).[5] The Ninth Circuit's decision in *Yamamoto* is

_____

[5] *See also Decision One Mortg. Co. v. Fraley*, 238 F.3d 420 (Table), No. 00-3270, 2000 U.S. App. LEXIS 33881, at *6 (6th Cir. Dec. 19, 2000) (non-precedential) (holding that "the district court did not err by exercising its equitable powers to condition rescission upon the [plaintiffs'] return of the loan balance received"); *Brown*, 683 F.2d at 447 ("A court may condition the granting of rescission upon plaintiff's repayment of the principal amount of the loan to the creditor."); *Fed. Deposit Ins. Corp. v. Hughes Dev. Co.*, 938 F.2d 889, 890 (8th Cir. 1991) ("[TILA] gives courts discretion to . . . condition[] rescissions upon the debtor's prior return of the principal." (citations omitted)); *Kratz v. Countrywide Bank*, No. 08-1233, 2009 U.S. Dist. LEXIS 86479, at *13-14 (C.D. Cal. Sept. 21, 2009) (noting that "[w]here rescission is not conditioned on the borrower's prior return of loan proceeds, rescission can result in the 'free house'—or 'gotcha'—phenomenon"); *Jobe v. Argent Mortg. Co., LLC*, No. 06-0697, 2009 U.S. Dist. LEXIS 70311, at *16 (M.D. Pa. Aug. 11, 2009) (observing that § 1635(b) "confers upon a trial judge . . . the discretion to condition rescission on tender by the borrower of the property he has received from the lender" (citation and internal quotation marks omitted)); *Parker*, 534 F. Supp. 2d at 537 n.9 ("When a borrower is unable to tender the loan proceeds, the remedy of unconditional rescission is inappropriate."); *Stanley v. Household Fin. Corp. III (In re Stanley)*, 315 B.R. 602, 614-15 (Bankr. D. Kan. 2004) ("The concept that a debtor is entitled to a free

38

instructive.  In *Yamamoto*, the plaintiffs alleged that the lender failed to provide them with the statutorily required notice of the right to cancel.  329 F.3d at 1169.  At summary judgment, the plaintiffs conceded that they were unable to tender the proceeds of the loan.  The district court found a triable issue of fact regarding the lender's failure to provide the plaintiffs with the requisite notice, but held that if the plaintiffs could not establish their ability to tender the loan proceeds in sixty days, then the court would dismiss the action.  When the plaintiffs failed to tender the loan proceeds, the district court dismissed the action.  On appeal, the Ninth Circuit affirmed the district court, holding that "a court may impose conditions on rescission that assure that the borrower meets her obligations once the creditor has performed its obligations."  *Id.* at 1173.

64.    The holding in *Yamamoto* and similar cases have their basis in the express provisions of TILA and Regulation Z that afford courts the discretion to modify the prescribed rescission procedures.  *See* 15 U.S.C. § 1635(b); 12 C.F.R. § 226.23(d)(4).  They are also based in equity.  Forcing a lender to relinquish its security interest despite evidence of a borrower's inability to meet her § 1635(b) rescission obligation of returning the loan proceeds would be irrational and unfair, and it would frustrate the "equitable goal of rescission under TILA" of "restor[ing] the parties to the 'status quo ante.'"  *See Shelton*, 486 F.3d at 820.

65.    The parties in this case did not specifically address whether Plaintiff is capable of tendering the loan proceeds.  Nevertheless, both parties adduced evidence that calls into question Plaintiff's ability to do so.  For instance, Plaintiff and her husband have filed for bankruptcy.

_____

home or financial windfall because a creditor failed to check a box on a notice of right to rescind form is an irrational result that fails to recognize the full scope and policy behind the TILA's rescission framework.").

(Trial Tr. 52:21 to 53:9; Ex. P-14.)  The bankruptcy judge initially ordered Plaintiff to pay $1669

a month on the mortgage, but Plaintiff eventually stopped making all payments.  (Trial Tr. 57:4-

18.)  Because there is a distinct possibility that Plaintiff will be unable to meet her rescission

obligations, conditioning rescission on her ability to do so is appropriate here.  In addition, the

equities of the instant case favor conditioning rescission on Plaintiff's repayment because

Ameribanq's conduct was unintentional and the inaccuracy in the disclosure of the finance

charge was not significant.  *See Yamamoto*, 329 F.3d at 1171 (discussing the court's holding in

*LaGrone v. Johnson*, 534 F.2d 1360, 1361-62 (9th Cir. 1976), and observing that because the

"TILA violations [in *LaGrone*] were not egregious . . . , the equities favored the creditor who

would otherwise have been left in an unsecured position in the borrower's intervening

bankruptcy").  Accordingly, Plaintiff shall have 60 days from the entry of this Memorandum and

accompanying Order to proffer the loan proceeds to Bank of New York in the amount of

$205,472.43—the amount of the loan minus the finance charge and other charges on the

disclosure statement.  (*See* Ex. D-9.)  *See also* 15 U.S.C. § 1635(b) (providing that when a

borrower invokes a valid right to rescission, she "is not liable for any finance or other charge");

*Semar v. Platte Valley Fed. Sav. & Loan Ass'n*, 791 F.2d 699, 705 (9th Cir. 1986).  Plaintiff may

decrease this amount by payments she has made to any Defendant that are supported by proper

documentation.  Upon a showing of good cause, Plaintiff may petition the Court for more time to

comply.  However, if Plaintiff is unable proffer the loan proceeds within a reasonable time.

Plaintiff's right to rescission is recinded.

### D.  ECOA

66.     Plaintiff bases the ECOA claim in Count Three of the Amended Complaint on

allegations that Ameribanq "significantly changed the terms of the . . . credit transaction and substituted different, less favorable terms without . . . advising the Plaintiff . . . ." (Am. Compl. ¶ 21.) Specifically, "Plaintiff maintains that the only pre-settlement disclosures she received were oral assurances from an Ameribanq loan officer that the monthly payments would not exceed $1700." (Pl.'s Pretrial Mem. at 2.) We have determined that the alleged factual predicate of Plaintiff's claim is false. On September 26, 2004, Plaintiff received and signed a Good Faith Estimate (Ex. D-1), a Preliminary Federal Truth in Lending Disclosure Statement (Ex. D-3), and a Notices & Disclosures to Applicant form (Ex. D-5). (Exs. D-3, D-5.) Thus, she did not meet her burden of proof on her ECOA claim.

67.     Furthermore, we note that Plaintiff has never argued, let alone introduced evidence, that Ameribanq discriminated against her. This is significant because ECOA is an anti-discrimination statute, which provides in pertinent part that

> [i]t shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction--
> (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract);
> (2) because all or part of the applicant's income derives from any public assistance program; or
> (3) because the applicant has in good faith exercised any right under the Consumer Credit Protection Act.

15 U.S.C. § 1691; *see also* 12 C.F.R. § 202.1 ("The purpose of this regulation is to promote the availability of credit to all creditworthy applicants without regard to race, color, religion, national origin, sex, marital status, or age (provided the applicant has the capacity to contract); to the fact that all or part of the applicant's income derives from a public assistance program; or to the fact that the applicant has in good faith exercised any right under the Consumer Credit Protection

Act.").  Plaintiffs alleging ECOA claims have the burden of showing that (1) they are a member

of a protected class; (2) they applied for credit from defendants; (3) they were qualified for the

credit; and (4) despite qualification, they were denied credit.  *In re Chiang*, 385 F.3d 256, 259

(3d Cir. 2004) (citing *Matthiesen v. Banc One Mortg. Corp.*, 173 F.3d 1242, 1246 (10th Cir.

1999)).  Here, Plaintiff introduced no evidence regarding the first, third, or fourth elements of the

claim.  Accordingly, Defendants are entitled to judgment in their favor on Plaintiff's ECOA

claim.

       **E.**       **UTPCPL**

      68.      Plaintiff has contended over the course of this litigation that her UTPCPL claim is

predicated on the alleged federal violations, arguing that "violations of truth in lending and of

ECOA, . . . equate to violations of the Unfair Trade Practices law."  (Trial Tr. 142:1-3; Pl.'s

Pretrial Mem. at 2.)  Plaintiff's argument is incorrect as a matter of law.  A violation of TILA is

not a per se violation of the UTPCPL.  *See, e.g.*, *Garczynski v. Countrywide Home Loans, Inc.*,

656 F. Supp. 2d 505, 514 (E.D. Pa. 2009) (collecting cases and observing that "[m]any judges in

[the Eastern District of Pennsylvania] have rejected Plaintiffs' argument that TILA and RESPA

violations are per se violations of the UTPCPL"); *see also id.* at 515 n.9 (noting that the

plaintiffs' counsel's failure to consider the case law was "unacceptable advocacy" and that "[a]

good lawyer is expected to cite, and then attempt to distinguish or disagree with, contrary

authority").  The UTPCPL requires the plaintiff to prove that a defendant "made a false

representation that deceived or had a tendency to deceive."  *See Fisher v. Advanta Fin. Corp. (In*

*re Fisher)*, No. 03-4666, 2005 U.S. Dist. LEXIS 884, at *71 (E.D. Pa. Jan. 20, 2005) (citing *Fay*

*v. Erie Ins. Group*, 723 A.2d 712, 714 (Pa. Super. Ct. 1999)).  In addition, plaintiff "has the

burden of establishing a causal connection to or reliance on the alleged misrepresentations."
*Fay*, 723 A.2d at 714.

69.     Plaintiff's case highlights why there cannot be a per se rule that a violation of TILA is a violation of the UTPCPL.  Defendants' TILA liability arises from a difficult-to-detect error of a third party.  Plaintiff did not need to establish deceit or detrimental reliance, which are essential elements of a UTPCPL claim.  Plaintiff failed to offer credible evidence establishing that Ameribanq's conduct was in any way deceitful or that she detrimentally relied on Ameribanq's TILA violation in deciding to proceed with the transaction.  Defendants are accordingly entitled to judgment on Plaintiff's UTPCPL claim.

## III. CONCLUSION

For the foregoing reasons, judgment against Ameribanq will be entered in the amount of $200; Plaintiff will have 60 days to proffer $205,472.43 to Bank of New York; and judgment will be entered in favor of Defendants on the remaining counts of the Amended Complaint.

An appropriate Order follows.

**BY THE COURT:**

_____
**R. BARCLAY SURRICK, J.**